**THE GARNER FIRM, LTD.**
**Adam Harrison Garner (035482004)**
**Melanie J. Garner (004982004)**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Phone: (215) 645-5955
adam@garnerltd.com
melanie@garnerltd.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JONATHAN MCCANN<br>240 Rt. 539<br>Cream Ridge, NJ 08514,<br>on behalf of himself<br>and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SHIRLEY S. HILL<br>262 E. Main Street<br>Moorestown, NJ 08057; and<br><br>VERNON W. HILL, II<br>262 E. Main Street<br>Moorestown, NJ 08057; and<br><br>INTERARCH, INC.<br>123 Chester Avenue<br>Moorestown, NJ 08057<br><br>Defendants.<br><br>INTERARCH, INC. PROFIT SHARING PLAN<br>AND TRUST,<br>123 Chester Avenue<br>Moorestown, NJ 08057<br><br>Nominal Defendant | Case No.<br><br><br><br>**CLASS ACTION<br>COMPLAINT** |

Plaintiff Jonathan McCann, individually on behalf of himself, and on behalf of all others similarly situated, through his undersigned counsel, alleges as follows.

## INTRODUCTION

1.      This is an action is brought pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by Plaintiff on behalf of himself and on behalf of a class of participants in and beneficiaries of the InterArch Profit Sharing Plan and Trust ("the Plan") to restore losses and to remedy Defendants' breaches of fiduciary duties and other violations of ERISA in connection with the investments of the assets of the Plan.

2.      The Profit Sharing Plan is a defined contribution plan where the investment decisions are made by the Trustee of the Plan. Participants do not have any power to decide and were not even told how Plan assets are invested.  Indeed, the Plan fiduciaries provided Plan participants with little information as to how their assets were actually invested and never provided any documentation regarding the Plan's investment allocation.

3.      On May 18, 2020, the Plan Administrator distributed the Summary Annual Report ("SAR") for the Plan that revealed for the first time that the value of Plan assets had declined from $17,140,761 as of November 1, 2018 to $3,899,407 as of October 31, 2019—a decline in net assets of $ 13,241,354—of which $12,537,629 represented a decrease in the value of its investments.  A letter accompanying the SAR explained only about the decline in the value of the investments that the Plan had experienced "difficulties in the market and our investments." Despite most investments in which a fiduciary of an ERISA-covered retirement plan could have prudently invested *increasing* over that same period of time, the fiduciaries of the Profit Sharing Plan provided *no explanation* about what the Plan had invested in that had caused such dramatic decline.

4.      The fiduciaries of the Plan held a telephone call with participants on May 21, 2020, but the fiduciaries refused to provide any additional information about the nature of the investments or answer specific questions posed by Plaintiff.

5.      Investigation by Plaintiff and his counsel has revealed that the overwhelming majority of the Plan's investments are and have been in the stock of Metro Bank, PLC, a London-based bank that is publicly traded on the London Stock Exchange.  Vernon Hill—a fiduciary of the Plan and the husband of Shirley Hill, the owner of InterArch—was the Chairman of the Board of Metro Bank until December 17, 2019, and the Hills had a significant investment in Metro Bank.

6.      According to filings that Shirley Hill, the sole Trustee of the Plan, signed and submitted to the United States Department of Labor (but which were not distributed to Plan participants), the Plan had approximately 70% of its assets in an undiversified asset as of October 31, 2018 and nearly 90% of its assets in undiversified assets as of October 31, 2019.  Based on information from InterArch's former CFO and her successor, all of those undiversified assets were in Metro Bank stock. Indeed, the decline of the stock price of Metro Bank stock would also correlate to a decline in the value of Plan assets holding that amount of Metro Bank stock.

7.      By deciding to invest such a large amount of stock in a single asset and to continue to maintain such investments, particularly one associated with the Hills, Shirley Hill as Trustee breached her fiduciary duties to invest the assets of the Plan in the best interests of the participants, prudently, in diversified assets, and consistent with the terms of the Plan and ERISA.  Given the resulting benefits to the Hills, such investments also constituted at least indirect prohibited transactions.

8.      As a remedy, Plaintiff seeks to enforce the rights of the participants and the Plan, to recover the losses incurred by the Plan as a result of the breaches of fiduciary duty under ERISA

or other violations, and to ensure that the Plan and its assets have been properly administered, managed, held in trust and distributed. Among the relief sought for these breaches and violations, Plaintiffs request the breaching fiduciaries be ordered to pay the losses to the Plan, to disgorge any profits, to provide an accounting, to have a surcharge imposed against them, and appropriate equitable relief against any non-fiduciaries and that any monies recovered for the Plan be allocated to the accounts of the Class.

## **JURISDICTION AND VENUE**

9.      The Court has general subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as it arises under ERISA—a law of the United States—and specifically pursuant to 29 U.S.C. §§ 1132(e)(1) and 1132(f), which gives the District Court jurisdiction to hear civil actions brought pursuant to 29 U.S.C. § 1132.

10.      Venue is proper in this District pursuant to 29 U.S.C. §1132(e)(2) because, at all relevant times, the Plan was and is administered in this District, the breaches and violations giving rise to the claims occurred in this District, and Defendants may be found in this District.  Venue is also proper under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants reside in this District.

11.      The Court has personal jurisdiction over Defendants as the Plan is administered in this District and Vicinage, and Defendants are domiciled in this District, and Defendants regularly transact business in this District and Vicinage. This Court  also has personal jurisdiction over Defendants because Defendants transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## THE PARTIES

**Plaintiff**

12.     Plaintiff Jonathan McCann is a former employee of InterArch, Inc. Plaintiff McCann was employed by InterArch from April 10, 2006 to October 31, 2019.   Plaintiff commenced his participation in the Plan in 2006, during the 2006-2007 plan year.   After his employment with InterArch ended, Plaintiff remained a participant in the Plan. As of October 31, 2019, Plaintiff McCann was a fully vested participant in the InterArch, Inc. Profit Sharing Plan within the meaning of the Plan and ERISA § 3(7), 29 U.S.C. § 1002(7) because he still has an account in the Plan and because has a colorable claim for additional benefits as a result of Defendants' breaches and violations. He resides in Cream Ridge, Monmouth County, New Jersey.

**Defendants**

13.     Defendant Shirley S. Hill is the President and chief executive officer of InterArch. According to the most recent Summary Plan Description issued to Plaintiff, Shirley Hill is and has been the Plan's Trustee. Shirley Hill is a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because of her position as Trustee and because she has discretionary authority and discretionary responsibility in the administration of the Plan.   As a fiduciary of the Plan, as the owner of at least 50% or more of the voting stock of InterArch, as the spouse of Vernon Hill (who is also a fiduciary), and as an officer and/or director of InterArch, Shirley Hill is also a "party in interest" as to the Plan as defined in ERISA § 3(14) (A), (E), (F), (H) & (I), 29 U.S.C. § 1002(14) (A), (E), (F), (H) & (I). Shirley Hill is a resident of Moorestown, Burlington County, New Jersey.

14.     Defendant Vernon W. Hill, II is the husband of Shirley Hill.  They have been married for over 40 years.  According to the proposed "Agreement and Release" provided by

Defendants to Plaintiff and the Class, Vernon Hill is "a fiduciary of the InterArch, Inc. Profit Sharing Plan and Trust."  As a result of that position, he is a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).  As Defendants have refused to produce the current Plan document and additional documents in response to Plaintiff's request, Plaintiff is unable to allege anything further about Vernon Hill's responsibilities.  Upon information and belief, including based on Vernon Hill holding himself out as the spokesman to address issues about the Plan on May 21, 2020, Vernon Hill has had or exercised discretionary authority and discretionary responsibility in the administration of the Plan.  Both as a fiduciary and as the spouse of Shirley Hill, Vernon Hill is a "party in interest" as to the Plan as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Vernon Hill is a resident of Moorestown, Burlington County, New Jersey.

15.     Defendant InterArch, Inc. is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Moorestown, Burlington County, New Jersey.  InterArch is the Plan's Sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), the designated Plan Administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a named fiduciary of the Plan within the meaning of ERISA § 402, 29 U.S.C. § 1102.

**Nominal Defendant**

16.     The InterArch Profit Sharing Plan and Trust ("the Plan" or "Profit Sharing Plan") is an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) ("the Plan"). The Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  According to the Plan's Form 5500s, the Plan was originally effective on November 1, 1976.  According to the Summary Plan Description ("SPD"), the written instrument, within the meaning of ERISA § 402, 29 U.S.C. §1102, by which the Plan is maintained,

was amended and restated as of November 1, 2014 ("the Plan Document"). According to the Plan

Document, its SPD, and most recent Form 5500 Report, the money that is contributed to the Plan

is held in trust pursuant to a trust agreement. The Plan is named as a nominal defendant in this

action pursuant to Rule 19 of the Federal Rules of Civil Procedure to ensure that complete relief

can be granted as to claims brought on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of the following persons ("the Class"):

> All participants in the InterArch, Inc. Profit Sharing Plan at any time between
> March 6, 2018 to the present (except those who terminated without vesting) and the
> beneficiaries of any such participants.

> Excluded from the Class are (1) Defendants, (2) any fiduciaries of the Plan, who
> are alleged to have engaged in prohibited transactions or breaches of corporate
> fiduciary duties, or who had decision-making or administrative authority relating
> to the administration, investment allocation, modification, funding, or
> interpretation of the Plan.

### Impracticality of Joinder

18.     The members of the Class are so numerous that joinder of all members is

impracticable. According to the 2017 Form 5500 InterArch filed with the Department of Labor

("DOL"), the Plan had 22 participants, including retired or separated participants entitled to future

benefits as of the end of the Plan Year (*i.e.*, October 31, 2017). According to the 2018 Form 5500

InterArch filed with the Department of Labor ("DOL"), which was the most recent Form 5500,

the Plan had 22 participants, including retired or separated participants entitled to future benefits

as of the end of the Plan Year (*i.e.*, October 31, 2018). Under the terms of the Plan, each participant

in the Plan was entitled to designate one or more beneficiaries, and every married participant had

at least one beneficiary (a spouse) and some participants likely designated more than one beneficiary.  As such, the class consists of at least 40 persons.

**Commonality**

19.     The issues of liability are common to all members of the Class and are capable of common answers as those issues include whether the fiduciary defendants breached various fiduciary duties to the Plan and its participants, whether Shirley Hill and Vernon Hill engaged in prohibited transactions, whether the fiduciary defendants are liable for their co-fiduciaries' breaches, whether InterArch knowingly participated in these breaches, whether the Plan suffered losses as a result of the fiduciary breaches and other violations and what is the appropriate relief of Defendants' violations of ERISA.

**Typicality**

20.     Plaintiff's claims are typical of the claims of other members of the Class because his claims arise from the same event, practice and/or course of conduct by Defendants. Specifically, Plaintiff, on behalf of the Class, alleges that Defendants breached their fiduciary duties or otherwise violated ERISA in connection with the investment of Plan assets, management of the assets of the Plan, or in performing their fiduciary duties to the Plan. Plaintiff's claims are also typical of the claims of the Class because they generally seek recovery and relief on behalf of the Plan.

**Adequacy**

21.     Plaintiff will fairly and adequately represent and protect the interests of the Class.

22.     Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

23.     Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

24.     Plaintiff is represented by counsel with extensive experience prosecuting class actions in general and ERISA class actions and particular experience and expertise regarding retirement plan litigation.

**Fed. R. Civ. P. 23(b)(1)(A)**

25.     The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied.  Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and their participants.  This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the Plan as a whole.  As a result, prosecution of separate claims by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

**Fed. R. Civ. P. 23(b)(1)(B)**

26.     The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied.  Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same.  Resolving whether Defendants fulfilled their fiduciary obligations to the Plan, engaged in prohibited transactions with respect to the Plan or knowingly participated in such breaches or violations as to Plaintiff's claims would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

**Fed. R. Civ. P. 23(b)(2)**

27.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole.  This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the Plan as a whole.  The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties or engaged in other violations of ERISA and injunctive relief.  As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

**Fed. R. Civ. P. 23(b)(3)**

28.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied.  The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan and Participants or violated ERISA.  As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations.  Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class.  As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

29.    A class action is a superior method to other available methods of the fair and efficient adjudication of this action.  As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the

entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

30.     The following factors set forth in Rule 23(b)(3) also support certification:

a.     The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.     No other litigation concerning this controversy has been filed by any other members of the Class.

c.     This District is the most desirable location for concentrating this litigation because (i) all Defendants are located in this District; (ii) the Plan was and is administered in this District; (iii) the majority of the participant class members are located in this District; and (iv) a number of the witnesses, including a number of relevant non-party witnesses, are expected to be located in this District.

d.     There are no difficulties in managing this case as a class action.

## FACTUAL ALLEGATIONS

**Background About InterArch**

31.     According to its website, "InterArch is an international design firm headquartered in Moorestown, NJ, specializing in architecture, interiors and branding."

32.     Although InterArch offers it services to the public, it has derived and currently derives a significant portion of its revenue by providing services to clients controlled or formerly controlled by Vernon Hill, including Commerce Bank, Metro Bank, and Republic Bank.

33.     InterArch or a predecessor related entity established the Plan to provide deferred compensation to its employees and as a tax-advantaged savings vehicle for Shirley Hill.

**The Terms of the Plan**

34.     The Plan operates on a November 1 to October 31 plan year.

35.     The Plan is funded primarily by employer contributions, except as to monies that participants have transferred from another tax-deferred retirement vehicle.

36.     When InterArch contributes to the Plan, its contributions are allocated to a Plan participant based on the following formula:

Your share of the profit sharing contribution is determined by the following fraction:

$$\text{Profit Sharing Contribution} \quad X \quad \frac{\text{Your Compensation}}{\text{Total Compensation of All Participants Eligible to Share}}$$

For example: Suppose the profit sharing contribution for the Plan Year is $20,000. Employee A's compensation for the Plan Year is $25,000. The total compensation of all Participants eligible to share, including Employee A, is $250,000. Employee A's share will be:

$$\$20,000 \quad X \quad \frac{\$25,000}{\$250,000} \quad or \quad \$2,000$$

37.     All InterArch non-union employees are eligible to participate in the Plan following one Year of Service with the company, as defined by the Plan.

38.     Participants in the Plan become fully vested in the Plan subject to the following schedule after six years of employment with InterArch.

**Profit Sharing Contributions.** Your "vested percentage" in your account attributable to profit sharing contributions is determined under the following schedule.

Vesting Schedule
Profit Sharing Contributions

| Years of Service | Percentage |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 | 100% |

39.     Pursuant to the 2001 Plan Document and Article IV of the SPD, the Plan's assets are supposed to be held in a trust managed by the Plan's Trustee.

40.     Pursuant to Section 7.1 and 7.2 of the 2001 Plan Document and the 2019 SPD,  the Trustee, is responsible for the investment of all assets held by the Plan unless the Trustee received written direction from the Employer or the Administrator or such function was delegated to an investment manager. No investment manager has been identified. No written direction from the Employer or Administrator has been provided. Even if the Shirley Hill as Trustee had received direction from the Employer or Administrator, as Shirley Hill controlled InterArch and also signed all Form 5500s from 2016 to the present for the Administrator, Shirley Hill would have merely been directing herself.

41.     Based on her signature as Trustee on the 2001 Plan Document and her identification as the Trustee in the SPD provided to Plaintiff in 2019, Shirley Hill has served as the Plan's Trustee continuously since at least 2002.

42.     According to the 2001 Plan Document, the Plan maintains a funding policy.  The funding policy, which was attached to the 2001 Plan Document provides as follows:

> Since the principal purpose of the plan is to provide benefits at normal retirement age, the principal goal of the investment of the funds in the plan should be both security and long-term stability with moderate growth commensurate with the anticipated retirement dates of participants. Investments, other than "fixed dollar" investments, should be included among the plan's investments to prevent erosion by inflation. However, investments should be sufficiently liquid to enable the plan, on short notice, to make some distributions in the event of the death or disability of a participant.

43.     Section 7.9 of the 2001 Plan Document provides that the Employer (*i.e.*, InterArch) had the power to remove the Trustee.

13

### The Hills' History of Prior Self-Dealing Activities

44.     Vernon and Shirley Hill have a well-documented history of mixing their personal relationship with their business dealings in a manner designed to further their own pecuniary interests, raising concerns about self-dealing and conflicts of interest along the way.

45.     In 1973, Vernon Hill founded Commerce Bancorp of Cherry Hill, New Jersey, which operated in the Delaware Valley through its subsidiary, Commerce Bank.

46.     Commerce Bank's stock traded on the New York Stock Exchange under the ticker: CBH.

47.     Vernon Hill served as Commerce Bank's chairman, president, and chief executive officer until an investigation by the Comptroller of the Currency ultimately led to his resignation in 2007 and Commerce Bank entering into a consent decree where it promised to cease engaging in insider business transactions.

48.     Pursuant to the consent agreement, Commerce Bank terminated its contracts with InterArch as well as with Vernon Hill's commercial real estate firm: Interstate Commercial Real Estate Inc.

49.     According to a January 15, 2008 article in the Philadelphia Inquirer, "[Mr.] Hill resigned June 29[, 2007] as federal bank regulators scrutinized long-disclosed, multi-million-dollar side businesses that he and his wife, [Shirley Hill], operated - renting real estate to Commerce Bank branches and furnishing them."

50.     During his tenure as Commerce Bank's chief executive, the Plan maintained a significant investment allocation in Commerce Bank's stock and InterArch generated millions of dollars in revenue for services billed to Commerce Bank.

51.     TD Bank Financial Group acquired Commerce Bank in 2007.

14

**Vernon Hill Founds Metro Bank & Engages in Significant Business with InterArch**

52.     In 2010, Vernon Hill returned to the banking industry and founded Metro Bank, PLC in the United Kingdom.  Its first branch opened on or about July 29, 2010.

53.     Vernon Hill served as Metro Bank's non-executive Chairman of the Board from its founding through December 17, 2019.

54.     InterArch provided architectural and related services to Metro Bank from its inception.

55.     According to Metro Bank's 2016 Annual Report, which was filed on or about March 23, 2017, Metro Bank paid InterArch at least £3,156,000 for architectural and related services in 2016, a 36.8% increase from £2,307,000 in 2015.

56.     On numerous occasions, Vernon Hill advised InterArch employees, including Plaintiff, at a firm Christmas party or in private, that "he was making [them] rich." At the time those statements were made, Plaintiff understood that there was some connection between InterArch and Metro Bank in that he provided architecture and design services to Metro Bank as an InterArch employee.

**The Plan Invests Heavily in Metro Bank**

57.     At some point in 2010, the Plan also acquired an equity position in Metro Bank. Upon information and belief, Shirley Hill as Trustee made the decision to use Plan assets to purchase stock in Metro Bank, a foreign corporation.  The Plan's investment in Metro Bank stock was not disclosed to its participants.

58.     At the time of this initial purchase until Metro Bank's IPO in 2016,  Metro Bank stock was not publicly traded, and was illiquid.  As a result, the purchase and continued holding of this stock violated the Plan's funding policy.

59.     As of October 31, 2009, the value of Plan assets, after subtracting liabilities of the Plan, was $11,031,463, compared to $10,952,690 as of November 1, 2008. InterArch contributed nothing to the Plan during the 2008-2009 plan year.

60.     As of October 31, 2010, the value of Plan assets, after subtracting liabilities of the plan, was $11,765,885, compared to $11,031,463 as of November 1, 2009. InterArch contributed nothing to the Plan during the 2009-2010 plan year. The value of plan assets, after subtracting liabilities of the plan, was $11,765,885 as of November 1, 2010.

61.     According to the Plan's 2010 Form 5500 Annual Report, at the close of the 2010-2011 plan year, $7,880,044—70.29% of the Plan's assets—were held in a single security, debt, mortgage, parcel of real estate, or partnership/joint venture. Upon information and belief, that single security was Metro Bank stock.

62.     According to an Annual Return Metro Bank filed with the Companies House, the government agency in United Kingdom responsible for maintaining such filings and making them available to the public, as of June 11, 2011, the Plan owned 355,302 shares of Metro Bank Class A Ordinary Shares.

63.     According to an Annual Return Metro Bank filed with the Companies House, as of June 11, 2012, the Plan possessed 410,216 Class A Ordinary Shares of Metro Bank stock.

64.     According to an Annual Return Metro Bank filed with the Companies House, on December 31, 2012, the Plan acquired an additional 48,330 Class A Ordinary Shares of Metro Bank stock.

65.     According to the Plan's 2013 Form 5500 Annual Report, at the close of the 2013-2014 plan year, $8,581,477—54.67% of the Plan's assets—were held in a single security, debt,

mortgage, parcel of real estate, or partnership/joint venture. Upon information and belief, that single security was Metro Bank stock.

66.    According to an Annual Return Metro Bank filed with the Companies House**,** as of September 29, 2014, the Plan owned 412,700 shares of Metro Bank Class A Ordinary Shares, having sold 45,846 shares that day.

67.    In March 2016, Metro Bank went public and its stock began trading on the London Stock Exchange ("LSE") on the FTSE 250 index following an initial public offering ("IPO") at an initial price of £20.00 per share. Metro Bank trades on the LSE under the stock ticker: "MTRO."

68.    The Plan subscribed to Metro Bank's IPO and purchased additional shares in Metro Bank.

69.    Metro Bank Class A Ordinary Shares were re-designated as ordinary shares on March 4, 2016.

70.    Metro Bank's stock price closed at £29.25 per share as of December 30, 2016.

71.    On October 31, 2017, Metro Bank stock closed at £35.57 per share.

72.    The value of plan assets, after subtracting liabilities of the plan, was $27,179,553 as of October 31, 2017, compared to $20,112,816 as of November 1, 2016.

73.    According to the Plan's 2016 Form 5500 Annual Report, at the close of the 2016-2017 plan year, $17,023,566—62.63% of the Plan's assets—were held in a single security, debt, mortgage, parcel of real estate, or partnership/joint venture. Upon information and belief, that single security was Metro Bank stock.

74.    On November 1, 2017, Metro's stock closed at £35.58 per share.

75.    On March 6, 2018, Metro Bank's stock closed at an all-time high of £40.40 per share.

**Metro Bank's Stock Sinks as Payments to InterArch are Revealed**

76.     From March 6, 2018 onward, Metro Bank's stock began a steady decline in value

that has continued to this day.  The following chart shows the dramatic decline in Metro Bank's

daily closing stock price since its IPO in March 2010 through May 20, 2020.



77.     In April 2018, Vernon Hill was reelected as Chairman of Metro Bank's Board of

Directors, notwithstanding a concerted campaign to oust him amidst concerns regarding the

propriety of the payments Metro Bank had made to InterArch.

78.     Beginning in or about March 2017, after Metro Bank released its 2016 Annual

Report revealing over £5,400,000 in payments to InterArch for services rendered over two years,

institutional shareholders began having concerns regarding InterArch's relationship with Metro

Bank.

79.     By April 2018, news articles began reporting about Metro Bank's and InterArch's relationship and its potential impropriety.[1]  After the publication of those articles, Metro Bank's stock price began to rapidly decline.

80.     In July 2018, Metro Bank was forced to raise additional capital by issuing additional shares, which diluted the value of the Plan's equity position in Metro Bank.  At that time, according to articles in the press, Metro Bank was viewed as relatively illiquid with an overly inflated valuation of three times its book value. [2]

81.     At some point in the fall of the 2018, prior to her retirement on or about October 31, 2018, Plaintiff asked Nancy Stewart, InterArch's then chief financial officer, how much of the Plan's assets were invested in Metro Bank, she stated that it "was all in Metro Bank stock" which Plaintiff understood to mean that the overwhelming majority of Plan assets were in Metro Bank stock.

82.      On October 31, 2018, Metro Bank's stock closed at £22.24 per share, a 37.5% decline since the beginning of the Plan year.

83.     At the same time that Metro Bank's stock was engaged in a precipitous decline, the Plan lost over $10,000,000, including nearly $9,000,000 in investment losses during the 2017-2018 plan year.  The value of Plan assets, after subtracting liabilities of the plan, was $17,140,761 as of October 31, 2018, compared to $27,179,553 as of November 1, 2017, a decline of 36.94%.

84.     At the same time that the Plan's investments were losing value, other investments that the Plan could have and should have been in were producing positive returns. For example, the S&P 500 index, a common benchmark for equity investments, returned 7.397% between November 2017 and October 2018 (and if dividends were reinvested more than 10%).

---

[1] *See, e.g.,* https://www.bbc.com/news/business-43877377
[2] See, *e.g.,* https://www.euromoney.com/article/b197d1t4vy5s7l/metro-bank-has-a-credibility-problem

85.     According to the Plan's 2017 Form 5500 Annual Report, at the close of the 2017-2018 plan year, $12,127,679—70.75% of the Plan's assets—were held in a single security, debt, mortgage, parcel of real estate, or partnership/joint venture. Upon information and belief, including the statement by Nancy Stewart, that single security was Metro Bank stock.

86.     Notwithstanding the dramatic change in Metro Bank's fortunes, Shirley Hill did not reduce or otherwise eliminate the Plan's investment in Metro Bank stock.

87.     As the 2018 plan year began, Metro Bank's stock closed at £23.14 per share on November 1, 2018, and the decline in the stock's value continued to accelerate.

88.     In January 2019, Metro Bank revealed that it had made errors in how it classified its loans causing the price of its stock to drop from £22.02 to £13.45 from January 22 to 23, 2019. In addition, it reported that its 2018 profits were approximately £50,000,000, whereas the market's expectations had been for them to be approximately £59,000,000.

89.     In May 2019, Metro Bank terminated its business relationship with InterArch after having paid InterArch more than £25,000,000.  That same month, Metro Bank raised an additional £375,000,000 through an additional issuance of new shares.  These new shares diluted the value of the Plan's investment in Metro Bank. At this same time, Metro Bank was under investigation by various government agencies in the United Kingdom.

90.     After the news broke that Metro Bank was severing its relationship with InterArch, Shirley Hill held a meeting in InterArch's conference room and advised Plaintiff and others that it was "fake news," not to "believe what you read in the papers," that "nothing is going to change," and that it was "business as usual."  She further reiterated that Plaintiff and others were to tell anyone who asked about InterArch not working for Metro Bank, and about Metro Bank's bad press, that "nothing is changing," and "we [InterArch] are not going anywhere."

91. On July 25, 2019, Metro Bank's stock declined in value by nearly 19% after Vernon Hill announced that he was stepping down as Metro Bank's chairman and that the bank experienced an 84% decline in profits according to its second quarter 2019 earnings report. Shirley Hill again told employees at InterArch, including Plaintiff, that this was "fake news" and not to believe what they read in the newspaper.

92. By the end of the 2018-2019 plan year, the value of Plan assets, after subtracting liabilities of the Plan, was $3,899,407 as of October 31, 2019 as compared to $17,140,761 on November 1, 2018. The Plan lost $12,501,598, which included employer contributions of $0, employee contributions of $0, other contributions of $0, gain/loss of $36,031 from the sale of assets, and earnings from investments of $-12,537,629. This represents a 77.25% decline in value.

93. At the same time that the Plan's investments were losing value, other investments that the Plan could have and should have been in were producing positive returns. For example, between November 2018 and October 2019, the S&P 500 returned 17.07%. Corporate bonds rated between A and AAA returned between 14% and 18% during that same period.

94. At some point in September or October 2019, Plaintiff asked Lisa Klym, who had succeeded Ms. Stewart at InterArch, if she knew whether the Plan remained invested in Metro Bank stock and, if so, the extent to which it was invested.

95. Ms. Klym responded to Plaintiff by advising him that neither Shirley Hill nor Vernon Hill would tell her exactly how heavily invested the Plan was in Metro Bank stock, but that she believed that most if not all of the Plan's assets were invested in Metro Bank.

96. When Plaintiff persisted and stated that he had a right to know this information regarding the Plan's investments, Ms. Klym indicated that she did not believe he was correct because it was "her [*i.e.*, Shirley Hill's] money."

21

97.   In October 2019, Metro Bank announced that Vernon Hill would leave the bank altogether.

98.   On October 31, 2019, Metro Bank's stock closed at £2.03 per share, a 91.24% decline in value over the course of the Plan year.

99.   According to the Plan's 2018 Form 5500 Annual Report, at the close of the 2018-2019 plan year, $3,452,711—88.54% of the Plan's assets—were held in a single security, debt, mortgage, parcel of real estate, or partnership/joint venture. Upon information and belief, and based on the comments of Ms. Stewart and Ms. Klym, that single security was Metro Bank stock, or another entity controlled by Defendants.

100.   Vernon Hill's position on Metro Bank's Board was terminated as of December 17, 2019.

**Plaintiff Requests Documents About the Plan**

101.   On April 13, 2020, Plaintiff sent InterArch a letter by certified mail, return receipt requested, requesting copies of various Plan documents pursuant to Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4).

102.   After learning that InterArch had not retrieved his 104(b) Request from the post office, Plaintiff emailed a copy of the 104(b) Request to Ms. Klym on April 27, 2020.

103.   Plaintiff subsequently learned that Shirley Hill advised Ms. Klym that Shirley Hill intended to dissolve the Plan and that Ms. Klym was not to respond to Plaintiff's 104(b) Request.

104.   InterArch failed to respond to the 104(b) Request within 30 days, as is required under ERISA.

105.   Counsel for Defendants finally responded to Plaintiff's 104(b) Request on May 26, 2020.  But even then, the response did not provide all the requested documents.  For example, the

response failed to provide Plaintiff with a copy of the 2014 Plan Document, which according to the SPD is the current written instrument, but instead provided only a copy of the 2001 Plan Document.

**The Plan Fiduciaries Reveal Large Losses Incurred by the Plan**

106.    On May 18, 2020, Plaintiff received an email from Ms. Klym providing his 2018-2019 plan year annual statement, the Plan's 2018-2019 Summary Annual Report, and a May 18, 2020 letter from Shirley Hill to Plan participants.

107.    Shirley Hill's May 18, 2020 letter announced that the Plan was to be terminated and that there would be a conference call to discuss the termination on May 21, 2020.

108.    Plaintiff's annual statement revealed that his Plan account had a balance of $24,449.83 as of October 31, 2019.  Despite never receiving a distribution from the Plan, Plaintiff's account balance declined by over $102,000 between November 1, 2017 and October 31, 2019, as a result of investment losses in the Plan.

109.    On May 20, 2020, Metro Bank's stock closed at 73 pence per share, having lost 98.19% of its value since its all-time high, and 64% of its value since the close of the 2018-2019 plan year.

**The Fiduciaries Hold A Conference Call with Participants**

110.    On May 21, 2020, Vernon Hill and Shirley Hill hosted a conference call on which their accountant, George Beppel, was also present to discuss the termination of the Plan.

111.    Vernon Hill started the call by thanking InterArch's personnel for all of the "great stuff we did" over the years. Immediately after that statement, Shirley Hill then said, "we now think it is time to end the Plan." After making that statement, Shirley Hill deferred to Vernon Hill

who led the remainder of the call and Shirley Hill made no further substantive statements on the call.

112.     Vernon Hill then advised the Plan's participants that they each should have received their annual statements for the Plan. Vernon Hill claimed that the Plan's investment in Metro Bank had been a "tremendous success" for a number of years, just like the Plan's investment in Commerce Bank before it, but that the price of the stock had declined.

113.     Vernon Hill also attempted to link the value of Metro Bank's stock as of October 31, 2019 with the COVID-19 outbreak; however, the COVID-19 outbreak did not begin to affect capital markets until February and March of 2020.  By contrast, the decline in Metro Bank stock began in March 2018 and there was a 91.24% decline in the value of Metro Bank stock by October 31, 2019 as compared to a year earlier.  And there was a 77.25% decline in the value of the Plan assets as compared to a year earlier.

114.     Defendants permitted Plan participants to ask questions during the May 21, 2020 conference call.  Plaintiff asked multiple questions, including:

- what was the Plan invested in during the 2018-2019 plan year;

- how much of the Plan's assets were invested in Metro Bank;

- who made the decision to make the Plan's investments;

- whether Shirley Hill  remained the Plan's Trustee, and if not, when did she cease to be the trustee, who is the present trustee, and when did he or she become the trustee; and

- did the Plan have any advisors assisting it with the investment allocation?

115.     Vernon Hill refused to answer each question, advising Plaintiff that "they provided all legally required information, no more and no less."  He also stated that he would not answer any "legal" questions.  Shirley Hill also did not provide any response to Plaintiff's questions.

24

116.    Plaintiff also inquired into the status of the 104(b) Request and the Hills refused to answer his question.

117.    Moreover, during the May 21, 2020 conference call, Vernon Hill stated that Shirley Hill would double each participant's account balance as of October 31, 2019 and pay each participant an additional $500 as a "gift," but then contradictorily expressed an expectation that the acceptance of this gift would be in exchange for some unstated thing of value—a *quid pro quo*—and that he expected a unanimous acceptance of this unclear *quid pro quo* by voice acclimation during the conference call.

**Defendants Attempt to Absolve Themselves from Liability**

118.    On May 22, 2020, Defendants' attorneys at Cozen & O'Connor sent Plaintiff and, upon information and belief, all participants in the Plan: (a) a letter from Jay Dorsch, an attorney at Cozen & O'Connor; (b) a memorandum from Shirley Hill; and (c) a proposed release of all claims against Shirley Hill, Vernon Hill, InterArch and a host of other Released Parties and an agreement of confidentiality as to its terms.

119.    The amount offered in the release was variously described as "additional benefits" or a "restorative payment" or a "gift."  In exchange for this "gift," Plaintiff and the participants would have to release all claims against InterArch, Vernon Hill and Shirley Hill with respect to their roles involving the Plan.  The amount offered was a mere fraction of what the Plan or Plaintiff's account had lost since 2018.

120.    Shirley Hill's memorandum that accompanied the release claimed that the Plan's investment losses were attributed to market losses relating to the COVID-19 pandemic.  But this statement ignores that the Plan's losses were incurred several months prior.  Contrary to Shirley

Hill's assertion, over the same time that the Plan was experiencing losses, the markets provided significant positive returns over the same period of time.

## COUNT I
### Breach of Fiduciary Duty Under ERISA §§ 404(a)(1)(A), (B), (C) & (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), (C) & (D) Against Defendant Shirley Hill

121.    Plaintiff repeats, reaffirms, and realleges paragraphs 1 through 120 of the Complaint as is they were fully restated at length herein.

122.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (B) with "care, skill, prudence, and diligence" and (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

123.    According to Article IV of the SPD, "[t]he Trustee or another designated person or entity is responsible for the investment of all assets held by the Plan."

124.    To fulfill those fiduciary duties, Shirley Hill as Trustee was required to ensure that that investments were in the best interests of the Plan and its participants, to undertake an appropriate and independent investigation of the investments the Plan made, and to ensure that the Plan's assets were appropriately diversified and were invested consistent with the Plan and ERISA. Among other things, Shirley Hill was required to conduct a thorough and independent review of any investments, to make certain that reliance on any and all experts' advice was reasonably justified under the circumstances, to make an honest, objective effort to read and understand any advice  and opinions and question the methods and assumptions that did not make sense.

125.    In order to adequately fulfill those duties, Shirley Hill had a continuing obligation to monitor the assets of the Plan on regular intervals and re-assess whether the Plan's investments continued to be consistent with her obligations to invest the assets of the Plan loyally, prudently, in diversified investments and consistent with the terms of the Plan and ERISA.

126.    The 2017 Form 5500 filed with the Department of Labor dated February 12, 2019, reported that as of Plan Year End 2017, the Plan had $12,127,679 in a single asset out of $17,215,815 in total assets of the Plan. In other words, 70.45% of the Plan's assets were in a single investment.

127.    The 2018 Form 5500 filed with the Department of Labor dated May 20, 2020, reported that as of Plan Year End 2018, the Plan had $3,452,711 in a single asset out of $ 3,903,907 in total assets of the Plan. In other words, 88.44% of the Plan's assets were in a single investment.

128.    According to Nancy Stewart who was the CFO at InterArch from at least September 2008 until October 2018, the overwhelming majority of the Plan's assets as of  October 31, 2018 were in Metro Bank (the company which Vernon Hill founded, for which he was the Chairman of the Board of Directors, and in which he had a substantial investment).

129.    Any loyal trustee who was acting in the best interests of the Plan and its participants would have recognized not only that there was a conflict of interest for the Plan to be invested in Metro Bank, but that it was not in the best interests of Plan participants to invest such a significant percentage of the Plan's assets in a single investment.

130.    No prudent Trustee who had engaged in a prudent process in deciding where to invest the Plan's assets would have decided to invest such a significant percentage of the Plan's assets in a single investment.

131.    An investment of 70-80% of the Plan's assets in a single investment or security is an undiversified investment.

132.    While Defendants have refused to provide a copy of the current written instrument of the Plan, Article XI of the SPD explains that "[t]he Trustee is responsible for the safekeeping of the trust fund and must hold and invest Plan assets in a prudent manner and in the best interest of you and your beneficiaries."  Additionally, Article IV of the SPD provides that"[i]nvestment decisions are made in the best interests of you and other Plan Participants."  As the SPD is supposed to accurately summarize the terms of the Plan, these statements are believed to summarize the actual terms of the Plan. As investing such significant amounts of Plan assets in Metro Bank stock was neither prudent nor in the best interests of the participants or beneficiaries of the Plan, the decision to invest such significant amounts of Plan assets in Metro Bank stock also violated the terms of the Plan.

133.    Even if some provision of the written instrument of the Plan required investing such a large percentage of the Plan's assets in Metro Bank or any other single, undiversified investment, such an investment (particularly one where Shirley Hill and her husband had a vested interest) would have been contrary to ERISA and the Trustee of the Plan would have been required to ignore that provision in the written terms of the Plan.

134.    All or nearly all of the decline in value of the assets of the Plan from March 2018 through October 31, 2019 (the most recent date as of which the Plan fiduciaries have provided information about the value of Plan assets) are attributable to the decline in value of Metro Bank stock.

135.    Had the Plan been invested in nearly any other prudent investment or combination of prudent investments (such as an S&P index fund, a bond index fund or even 10 year Treasuries), the Plan' assets would have *increased* by at least 10% to 14%.

136.    By failing to loyally and prudently invest and diversify the assets of the Plan consistent with the terms of the Plan and ERISA, Defendant Shirley Hill breached her fiduciary duties under ERISA § 404(a)(1)(A), (B), (C) and (D), 29 U.S.C. § 1104(a)(1)(A), (B), (C) and (D) and caused the Plan to incur large losses.

**COUNT II**
**Prohibited Transactions in Violation of ERISA**
**§ 406(b)(1) & (3), 29 U.S.C. § 1106(b)(1) & (3)**
**Against Defendants Shirley Hill, Vernon Hill and InterArch**

137.    Plaintiff repeats, reaffirms, and realleges paragraphs 1 through 136 of the Complaint as is they were fully restated at length herein.

138.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) provides that "a fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

139.    ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) provides that "a fiduciary with respect to a plan shall not receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

140.    Shirley Hill, Vernon Hill and InterArch were each fiduciaries of the Plan pursuant to ERISA § 3(21) at the time that the Plan engaged in purchases of Metro Bank stock.  As a result of such positions, the prohibitions of ERISA § 406(b) applied to each of them.

141.    The purchase(s) of Metro Bank stock by the Plan constituted transactions involving assets of the Plan.

142.    Upon information and belief, Defendant Shirley Hill made the decision to invest a substantial amount of the assets of the Plan in Metro Bank to further her husband's interests and

therefore her own interests and also for her own personal individual interests so that InterArch, which Shirley Hill owned either wholly or in substantial part, would receive business from Metro Bank and to enrich herself.

143.    By deciding to invest Plan assets and keep Plan assets in Metro Bank stock, Defendant Shirley Hill dealt with the assets of the Plan in her own interest in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

144.    As a fiduciaries of the Plan, Shirley Hill, Vernon Hill and InterArch were each a beneficiary of transactions that provided consideration to one or more of them and from which they directly or indirectly through Metro Bank or InterArch received consideration for their own account from a party dealing with the Plan in connection with a transaction involving the assets of the Plan in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

**COUNT III**
**Prohibited Transactions  in Violation of ERISA**
**§ 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D)**
**Against Defendants Shirley Hill, Vernon Hill and InterArch**

145.    Plaintiff repeats, reaffirms, and realleges paragraphs 1 through 144 of the Complaint as is they were fully restated at length herein.

146.    ERISA § 406(a)(D), 29 U.S.C. § 1106(a)(D) provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a *direct or indirect* . . . transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest." (emphasis added)

147.    ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A) defines a "party in interest" to include "any fiduciary . . . of such employee benefit plan" as well as "an employer any of whose employees are covered by such plan."

30

148.    As fiduciaries of the Plan, Defendants Shirley Hill and Vernon Hill were each a party in interest pursuant to ERISA § 3(14)(A).

149.    ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H) defines a "party in interest" to include "an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors) of a person described in subparagraph" (C), among other subparagraphs. Subparagraph (C) refers to ERISA § 3(14)(C), 29 U.S.C. § 1002(C), which defines a party in interest to include "an employer any of whose employees are covered by such plan."  InterArch was a party in interest pursuant ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C). As an officer and director of InterArch, Defendant Shirley Hill was a party in interest pursuant to ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

150.    Regardless of whether Vernon Hill was a fiduciary or otherwise connected to InterArch, as the spouse of Shirley Hill, Vernon Hill is a "party in interest" as to the Plan as defined in ERISA § 3(14)(F), 29 U.S.C. § 1002(14)(F).

151.    The purchase(s) of Metro Bank stock by the Plan constituted transactions involving assets of the Plan.

152.    Upon information and belief, Defendant Shirley Hill made the decision to and caused the Plan to invest a substantial amount of the assets of the Plan in Metro Bank to use the assets of the Plan to benefit herself and or benefited her husband's interests (and indirectly her own interests), for her own personal individual interests and to benefit InterArch (and also indirectly for her own benefit as the primarily or exclusive owner).

153.    By making the decision to invest Plan assets in Metro Bank stock, Defendant Shirley Hill caused the Plan to engage in a prohibited transaction in violation of ERISA § 406(a)(D), 29 U.S.C. § 1106(a)(D).

154.    As parties in interest, Defendants Vernon Hill and InterArch are liable for the violations of ERISA § 406(a)(D), 29 U.S.C. § 1106(a)(D), pursuant to ERISA § 502(a)(3), 29 U.S.C. §1132(a)(3).

**COUNT IV**
**Breach of Fiduciary Duty Pursuant to ERISA § 404(a)(A)(1)(A) & (B), 29 U.S.C.**
**§ 1104(a)(A)&(B) For Failure to Disclose Information Against All Defendants**

155.    Plaintiff repeats, reaffirms, and realleges paragraphs 1 through 154 of the Complaint as is they were fully restated at length herein.

156.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and … (B) with "care, skill, prudence, and diligence."

157.    An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

158.    "Drawing on the Restatement of Trusts and other non-ERISA sources of fiduciary principles," the Third Circuit held in *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993), that "once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the

beneficiary's circumstance [and] even if that information comprises elements about which the beneficiary has not specifically inquired."

159.    As the Supreme Court explained in *Mertens v. Hewitt Associates*, 508 U.S. 248, 259 n. 9 (1993), one of the principles of the common law of trusts incorporated into ERISA is the duty imposed on a trustee and other ERISA fiduciaries to provide an accounting to the participants and beneficiaries.

160.    The Restatement (Second) of Trusts § 172 explains that a trust "beneficiary may by a proper proceeding compel the trustee to render to the proper court an account of the administration of the trust."  The Restatement (Second) of Trusts § 173 likewise provides that "the beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust."

161.    One of the trust law treatises cited and relied on by the Supreme Court, Bogert & Bogert, *The Law Of Trusts And Trustees* § 861, explains that "[t]his basic remedy includes inspection of the trust property and records and papers, securing from the trustee relevant information, and obtaining an accounting in court."

162.    The May 21, 2020 Conference Call with Plan participants was ostensibly designed to provide participants with information, but the Plan fiduciaries, Vernon Hill and Shirley Hill, refused to provide any substantive answers to questions about the plan, its investments, its fiduciaries or even the plan termination process.

163.    Again on May 22, 2020, Shirley Hill's memorandum improperly and incorrectly attributed losses in the Plan between October 2017 and October 2019 as related to market losses related to COVID-19 instead of truthfully telling participants that the market losses related to her decision to continue to invest a huge percentage the Plan's assets in a single security, Metro Bank.

164.    By failing to provide Plaintiff and the other participants in the Plan with sufficient information to allow them to know whether they have received the correct amount of benefits and the cause of the Plan's losses, Defendants breached their fiduciary duties.

165.    As a result, Plaintiff and the Class are entitled to obtain sufficient records, papers and other information about the Plan and an accounting.

**COUNT V**
**Breach of Fiduciary Duty to Monitor Under ERISA §§ 404(a)(1)(A), (B) and (D),**
**29 U.S.C. §§ 1104(a)(1)(A), (B) and (D) Against InterArch**

166.    Plaintiff repeats, reaffirms, and realleges paragraphs 1 through 165 of the Complaint as is they were fully restated at length herein

167.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

168.    Under ERISA § 404(a)(1)(A) and (B), a fiduciary with the authority to appoint and/or remove other fiduciaries has an obligation to undertake an appropriate investigation that the fiduciary is qualified to serve in the position as fiduciary and at reasonable intervals to ensure that the fiduciary who has been appointed remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA.

169.     According to Section 7.9 of the 2001 Plan Document, InterArch had the power to remove the Trustee.

170.     As the Plan Administrator, InterArch knew or in the exercise of reasonable diligence, should have known that the Trustee had invested a majority of the Plan assets in Metro Bank stock and that such an investment was (a) not in the best interests of the Plan's participants, and likely driven by conflicted interests, (b) was not the result of a prudent process and was not substantively prudent, (c) constituted an undiversified investment, and (d) was inconsistent with the terms of the Plan Document and/or ERISA.

171.     Had InterArch properly monitored Shirley Hill as Trustee, InterArch should have done at least the following: (a) promptly removed Shirley Hill as the Trustee, (b) appointed an independent fiduciary or successive Trustee and (c) taken actions necessary to remedy any fiduciary breaches.

172.     By failing to properly monitor Shirley Hill as Trustee and/or failing to take appropriate action upon learning of information suggesting that Shirley Hill had breached her duties, InterArch breached its fiduciary duties under ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A), (B) and (D).

### COUNT VI
### Failure to Provide Documents Upon Request Pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4) & ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) Against Defendant InterArch As Plan Administrator

173.     Plaintiff repeats, reaffirms, and realleges paragraphs 1 through 172 of the Complaint as is they were fully restated at length herein.

174.     ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), provides that the administrator of an employee benefit plan "shall, upon written request of any participant or beneficiary, furnish a copy

of certain enumerated documents as well as "other instruments under which the plan is established or operated" to the requesting participant or beneficiary within 30 days of the Request.

175.    The SPD and the Form 5500s filed with the Department of Labor identify InterArch as the Plan Administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

176.    On April 13, 2020, Plaintiff sent a letter requesting various Plan documents from InterArch, in its role as the Plan's Administrator, including the complete Plan document, Summary Plan Description, trust agreement, as well as those other documents under which the Plan is established or operated, in accordance with ERISA § 104(b), 29 U.S.C. § 1024(b).

177.    InterArch did not produce any documents to Plaintiff in response to his ERISA § 104(b) Request within 30 days. In fact, InterArch never fully responded to Plaintiff's request.

178.    InterArch has failed to comply with Plaintiff's ERISA § 104(b) request because Shirley Hill instructed to Lisa Klym to not respond to Plaintiff's request, Vernon Hill and Shirley Hill refused to discuss the 104(b) Request during the May 21, 2020 conference call, and because InterArch's untimely response to the 104(b) Request (through counsel) was incomplete.

179.    Thus, InterArch has failed to comply with Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4).

180.    Plaintiff has been prejudiced by InterArch's failure to comply with ERISA § 104(b), 29 U.S.C. § 1024(b), including in and his requests by, *inter alia*, not receiving complete and authoritative copies of the Plan documents to review and use in litigating his claims, individually, on behalf of the Plan, and on behalf of similarly situated individuals, against Defendants.

181.    Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c), and 29 C.F.R. § 2575.502c-1, the failure to produce the requested documents within 30 days of Plaintiff's request exposes

InterArch, as the Plan's Administrator, to statutory penalties in an amount not exceeding $110 per day for each day that the request remains unfulfilled beyond the 30-day deadline.

182.     Pursuant to ERISA § 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A), a participant may bring a civil action to obtain the relief authorized by 29 U.S.C. § 1132(c) and 29 C.F.R. § 2575.502c-1.  Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c), "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish" by mailing the requested material to "the requesting participant . . . within 30 days after such request" may be liable for up to $110 per day in civil penalties.

183.     As a result of its failure to produce the requested documents, Defendant InterArch is liable for the penalties under ERISA § 502(c), 29 U.S.C. § 1132(c) and Plaintiff is entitled to an award of statutory penalties.

## ENTITLEMENT TO RELIEF

184.     By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the Class are entitled to sue each of the Defendants, (each of whom are fiduciaries) pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

185.     By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the other participants and beneficiaries in the Plan and the Class prays that judgment be entered against Defendants on all claims, and requests that the Court order or award the following relief:

A.      Declare that each of the Defendants who are alleged to be a fiduciary breached his, her or its fiduciary duties under ERISA;

B.      Require each fiduciary found to have breached his/her/its fiduciary duties to the Plan to jointly and severally restore all losses to the Plan that resulted from the breaches of fiduciary duty or to disgorge any profits pursuant to ERISA § 409(a), or ERISA § 405;

C.      Require that InterArch and the Trustee provide an accounting to the Plan participants;

D.      Declare any transaction that constitutes a prohibited transaction void and (1) requiring any fiduciary or party-in-interest to disgorge any profits made, (2) declaring a constructive trust over the proceeds of any such transaction or (3) any other appropriate equitable relief, whichever is in the best interest of the InterArch Profit Sharing Plan;

E.      Require that the proceeds of any recovery for the Plan be allocated to the accounts of the Class Member participants in the Plan (other than any Defendants) in proportion to the injury that they suffered as a result of the breach of fiduciary duty;

F.      Order the removal of any of the breaching fiduciaries from their position as fiduciaries for the Plan and enjoin any of the breaching fiduciaries from acting as fiduciaries for any plan that covers any members of the Class;

G.      Appoint an Independent Fiduciary to manage the Plan at Defendants' expense;

H.      Order pursuant to ERISA § 206(d)(4) that any amount to be paid to the Plan accounts of the Class can be satisfied by using or transferring any breaching fiduciary's Plan account in the Plan (or the proceeds of that account) to the extent of that fiduciary's liability;

I.      Award Plaintiff McCann $110 per day in statutory penalties per violation from May 13, 2020 until the date InterArch comes into compliance with ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4) for the failure to provide the documents requested pursuant to ERISA § 104(b);

J.      Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1) and/or ordering the payment of reasonable fees and expenses of this action to Plaintiffs' Counsel on the basis of the common benefit and/or common fund doctrine (and/or other applicable law) out of any money or benefit recovered for the Class in this action;

K.      Award prejudgment interest and post-judgment interest; and

L.      Award any such other relief that the Court determines that Plaintiffs and the Class are entitled pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or otherwise.


Respectfully submitted,


            /s/ Adam H. Garner
Adam Harrison Garner (035482004)
Melanie J. Garner (004982004)
THE GARNER FIRM, LTD.
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(215) 645-5955 (Tel)
(215) 645-5960 (Fax)
adam@garnerltd.com
melanie@garnerltd.com

R. Joseph Barton
(*Pro Hac Vice* Application to be Filed)
BLOCK & LEVITON LLP
1735 20th Street, NW
Washington D.C. 20009
Telephone: (202) 734-7046
Fax:    (617) 507-6020
jbarton@blockesq.com

Dated: May 27, 2020

## LOCAL RULE 11.2 AND LOCAL RULE 201.1 CERTIFICATION

I hereby certify that that the damages recoverable in this action exceed the sum of $150,000,

exclusive of interest and costs and any claim for punitive damages.  I further certify, pursuant to

28 U.S.C. § 1746, that the foregoing matter in controversy is not the subject of any other action

pending in any court, or of any pending arbitration or administrative proceeding, to the best of my

knowledge, information, and belief.


            /s/ Adam H. Garner
Adam Harrison Garner